[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-15027

_____

D.C. Docket No. 9:13-cv-80344-JMH

BARI E. MARTZ,

Plaintiff-Appellant,

versus

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 19, 2016)

Before WILSON, JULIE CARNES, and EBEL,[*] Circuit Judges.

JULIE CARNES, Circuit Judge:

_____

[*] Honorable David M. Ebel, United States Circuit Judge for the Tenth Circuit, sitting by designation.

Claimant Bari Martz appeals the district court's order affirming the decision of the Social Security Commissioner ("Commissioner") to award disability insurance benefits to her for a closed period of disability from January 26, 2007, until September 10, 2010.  The Commissioner declined to award disability benefits beyond September 10, 2010, based on a finding of the Administrative Law Judge ("ALJ") that Martz had experienced significant medical improvement as of September 11, 2010, sufficient to allow her to perform a full range of light work.  This being the case, the Commissioner determined that Martz could perform her past relevant work as an art teacher, and therefore was not disabled as of this later date.  Martz challenges the Commissioner's decision, arguing that she remains unable to work on a continued and sustained basis due to chronic fatigue and other symptoms stemming from her scleroderma disease.

On appeal, Martz challenges the ALJ's determination on three grounds.  First, she asserts that the ALJ assigned too low a weight to the opinions of her treating physician, Dr. Joseph Shanahan, and too high a weight to the non-examining medical expert, Dr. John Griscom.  She further contends that the ALJ erred by discrediting her subjective complaints of impairment.  Finally, she argues that the ALJ violated her due process rights by denying her request to cross-examine Dr. Griscom.  After careful review, and with the benefit of oral argument,

we reverse the district court's order affirming the Commissioner's denial of benefits and remand.

## I.  BACKGROUND

### A.    Disability Application

In 1995, Martz developed Raynaud's phenomenon, a disorder that causes the blood cells in the fingers and toes to constrict when an individual is cold or stressed.  Approximately ten years later, Martz noticed increased symptoms related to her Raynaud's condition, and she also began experiencing a dry cough, gastroesophageal reflux, swelling in her hands, and tightening of the skin over her hands, forearms, face, and lower extremities.  In October 2006, she was diagnosed with cutaneous scleroderma, an autoimmune disease that causes the body to over-produce collagen, which in turn affects the skin, joints, and internal organs.  Martz's condition declined rapidly.  By November 2006, she had decreased pulmonary function and was later diagnosed with interstitial lung disease, secondary to the scleroderma.  In an effort to slow the progression of the disease, Martz participated in a clinical trial at Duke University in February 2007, undergoing myeloablative therapy (high dose chemotherapy and radiation), followed by a stem cell transplant.

Martz applied for disability insurance benefits in November 2007.[1] Alleging a disability onset date of January 26, 2007, she asserted that she was disabled and unable to work due to the scleroderma. The Commissioner concluded that Martz met the medical requirements for disability, but only for the one-year period following her stem cell transplant: that is, from January 26, 2007, until February 26, 2008. Martz then requested a hearing before an ALJ.

## B.    Administrative Hearing

At the first hearing in September 2010, the parties agreed to extend the period of time for which Martz should be found to be disabled by one year, through February 27, 2009. A second hearing was held in March 2011, at which the ALJ agreed to send a second set of interrogatories to the medical expert selected by the Commissioner. A third and final hearing was held on September 22, 2011, at which Martz testified as the only witness in support of her disability application. Prior to that hearing, Martz was permitted to send a third set of interrogatories to the expert, which the expert returned prior to the hearing.

### 1.    Martz's Testimony

Martz testified that she was 52 years old and held a master's degree in business administration. She had previously worked as a retail manager, and then

---

[1] For unknown reasons, Martz's disability insurance benefits application is not included in the administrative record. The parties also appear to dispute the date in which Martz filed the application. However, the date of filing is not relevant to the issues raised on appeal.

4

an art teacher, but was forced to stop working in January 2007 after being diagnosed with "life threatening systemic, scleroderma." At that time, she had only 40 percent lung capacity and less than six months to live. After undergoing a stem cell transplant, however, her lung function and quality of life improved. She did not return to normal functionality, however.

Martz testified that fatigue, which was the result of hemolytic anemia, prevented her from returning to work full-time. She had obtained a part-time job in August 2010, training new docents at the Boca Raton Art Museum, and she could handle these job duties because the job only involved working two days a week, during which she remained seated most of the time except for some walking during the trainees' practice tours. Martz initially worked eight hours per day, earning $15.45 per hour. She found, however, that working eight hours on a given day tired her too much and therefore she had to reduce her schedule to seven hours per day during each of the two days each week she worked. Martz explained that she was able to perform this part-time job only because it was so flexible. That is, she could stay seated as long as her fatigue required her to do so, and could get up and move around if she was no longer comfortable remaining seated. Further, her employer permitted her to go home early whenever she became too tired to continue working.

5

With respect to her daily activities, Martz cooks light meals and drives her car no more than five to ten miles away from home, but her husband performs the more strenuous household tasks, such as vacuuming and cleaning. She testified that there had not been one day during the operative period of time when she has not felt fatigued, and there have been some days when she had been unable even to get off of the couch.

### 2.    Medical Record

In addition to Martz's testimony, the evidence before the ALJ also included Martz's medical record, opinions from her treating physicians (Dr. Shanahan and Dr. Keith Sullivan), and three sets of interrogatories completed by the medical expert, Dr. Griscom. According to Martz's medical records between 2007 and 2010, her condition stabilized after the stem cell transplant in 2007 and her symptoms gradually improved. In February 2010, she required arthroscopic surgery on her right knee but by March 2010, she was able to walk with a cane.

Dr. Shanahan—a board-certified rheumatologist and former clinical director of the Duke Scleroderma Research Center Clinic to which Martz traveled for treatment—provided sworn testimony on February 18, 2011, in which he described Martz's impairments and limitations. He stated that he began treating Martz in 2006, and he had seen her approximately every three months thereafter. He explained that since February 2008, Martz had reported persistent and profound

fatigue that he believed was most likely caused by hemolytic anemia. Martz had also exhibited numerous other symptoms, including stiffness, pain, loss of dexterity, joint swelling, visible Raynaud's phenomena, low red blood cell counts, and persistent but stable shortness of breath. Dr. Shanahan opined that Martz's scleroderma met the requirements for section 14.04 of the listing of impairments because it caused moderate to severe limitations in her lungs, skin, musculoskeletal system, lymphatic system, and vascular system. Moreover, due to fatigue, she would need to rest frequently without restriction on her ability to take such breaks. In Dr. Shanahan's opinion, Martz could not perform even sedentary work on a sustained basis.

On September 21, 2011, one day before the third administrative hearing, Dr. Shanahan submitted an additional statement via e-mail concerning the impact of hematocrit (volume percentage of red blood cells) and hemoglobin (protein molecules in the red blood cells) on Martz's work capability. He noted that Martz suffered from decreased muscle efficiency, which in conjunction with her anemia, impaired not only her muscle performance but also any ability to improve that muscle performance. Although Martz's interstitial lung disease was stable, it would never improve. Ironically, the aggressive treatment that had saved Martz's life also degraded the normal compensatory mechanisms that would have otherwise restored her functional capacity. The doctor did not believe that Martz's

7

underlying disease and aggressive treatment "preserved her ability to work." Finally, he noted that focusing solely on a patient's hematocrit reading to determine functional capacity, without considering the impact of the patient's other "comorbidities" was "nonsensical."

Dr. Sullivan, a physician with the Duke University Medical Center (Division of Cellular Therapy), also treated Martz during the same time period as Dr. Shanahan. In June 2010, prior to the first hearing, Dr. Sullivan completed a medical statement regarding Martz's illness, physical abilities, and limitations. He opined that Martz was able to stand for 15 minutes at a time, sit for two hours at a time, and lift five pounds occasionally, but she could not lift on a frequent basis. While she could occasionally bend and balance, she could never stoop, manipulate her left and right hands, or raise her right and left arms above her shoulder. He characterized Martz's pain as severe and estimated that she would only be able to work two hours per day.

On February 25, 2011, prior to the second hearing, Dr. Sullivan completed a second statement providing further comments concerning Martz's anemia. In particular, he stated that Martz tested positive for hemolytic anemia in March 2007, but had not required any treatment at that time. In May 2010, however, Martz started experiencing extreme fatigue and underwent further testing and a bone marrow biopsy. Following a second bone marrow biopsy and more testing in

September 2010, it was confirmed that Martz had hemolytic anemia, but "thankfully" there had been no evidence of myelodysplasia or leukemia.

### 3.    Interrogatories from Medical Expert, Dr. Griscom

At the request of the ALJ, Dr. Griscom—an internist and medical expert often used by the Commissioner—reviewed Martz's medical record and completed a set of medical interrogatories on August 12, 2010.  Dr. Griscom concluded that Martz's scleroderma qualified for a one-year closed period of disability beginning on the date of her stem cell transplant.

Dr. Griscom completed a second set of interrogatories on April 11, 2011, shortly after the second hearing.  He stated that Martz's blood count was stable, but acknowledged that she nonetheless experienced "some" fatigue and her anemia never entirely disappeared after her stem cell transplant.  Further, the anemia concerns evident in May 2010 had seemed to stabilize as of September 2010.  Based on the medical record, Dr. Griscom believed that Martz was disabled through September 2010 due to her anemia and right-knee pain, but that she was capable of performing sedentary work after September 2010, and perhaps even before that time.

On August 29, 2011, Dr. Griscom completed a third and final set of interrogatories that were prepared by Martz's attorney.  Dr. Griscom stated that he did not believe that Martz's fatigue was so significant that she could not perform

sedentary work.  He agreed with Dr. Shanahan that Martz's scleroderma involved all of her systems, but noted that Martz had not only improved dramatically since her stem cell treatment, but that she was also active and motivated.  Although her chronic disease prevented her from attaining normal functionality, he did not believe this compromised her ability to perform sedentary work.

### C.    ALJ's Decision

Following the administrative hearing, the ALJ issued a partially favorable decision, finding that Martz was disabled from January 26, 2007, through September 10, 2010.  Nevertheless, the ALJ determined that Martz was capable of performing substantial gainful activity and no longer disabled as of September 11, 2010, which was the same date that the non-examining expert flagged as the date on which he believed Martz to no longer be disabled.

Based on his review of the evidence, the ALJ concluded that from January 26, 2007, until September 10, 2010, Martz suffered from the following severe impairments: scleroderma, interstitial lung disease with polyarthritis, anemia, Raynaud's disease, post-stem cell transplant and myeloablative bone marrow status, and osteoarthritis of the right knee.  The ALJ concluded that from January 26, 2007, through September 10, 2010, the severity of Martz's systemic scleroderma met the requirements for section 14.04 of the listing of impairments.

However, the ALJ determined that as of September 11, 2010, Martz no longer met the requirements of section 14.04 based on her significant medical improvement, and that she was therefore capable of performing a full range of light work[2] as of the above date. Based on this finding, the ALJ concluded that Martz was capable of performing her past relevant work as an art teacher. The Appeals Council denied Martz's request for review.

### D.    District Court Proceedings

In April 2013, Martz filed a complaint in the district court challenging the Commissioner's denial of disability insurance benefits. Both parties filed opposing motions for summary judgment. The district court[3] subsequently granted summary judgment in favor of the Commissioner, affirming the ALJ's decision. Martz now appeals from that decision.

## II.  DISCUSSION

### A.    Standard of Review

We review the ALJ's application of legal principles *de novo*. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). We review the ALJ's findings of fact to determine whether the latter is supported by substantial evidence. *Id.* Substantial evidence is "more than a scintilla, but less than a preponderance."

---

[2]  As set out *infra*, "light work" is more strenuous than "sedentary work."

[3]  The parties consented to a magistrate judge entering final judgment. For ease of reference, this opinion refers to the magistrate judge as the district court.

*Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotations omitted).

When reviewing for substantial evidence, we may not reweigh the evidence, decide

facts anew, or substitute our own judgment for the decision of the Commissioner.

*Id.* We must affirm the Commissioner's decision if it is supported by substantial

evidence, regardless of whether "the proof preponderates against" the

Commissioner's decision. *Id.*

### B.    Process for Determining Eligibility for Disability Insurance Benefits

Disability is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To be eligible for disability insurance benefits, a claimant must establish that she

was under disability on or before the last date for which she was insured. *Id.*

§ 423(a)(1)(A), (c)(1); *Moore*, 405 F.3d at 1211. Martz met the insurance

requirements through September 30, 2013, and therefore she must establish that

she was disabled on or before that date. *See Moore*, 405 F.3d at 1211.

A claimant's entitlement to disability benefits ends when the claimant's

medical condition improves sufficiently to permit her to engage in substantial

gainful activity. 42 U.S.C. § 423(f)(1). In cases such as this, where Martz was

found disabled for only a limited period of time, the ALJ uses an eight-step inquiry

to determine whether disability benefits should be terminated based on the claimant's medical improvement.[4]  20 C.F.R. § 404.1594(f).  At issue here are steps seven and eight.  Step seven calls on the ALJ to determine whether the claimant has regained the capacity to perform her past relevant work.  If the claimant is unable to perform her past relevant work, the ALJ then proceeds to step eight to decide whether the claimant could perform other work in the national economy.  *See id.* § 404.1594(f)(7)-(8).  Here, because he concluded that Martz had improved enough to have regained sufficient capacity to resume her former duties as an art teacher, the ALJ stopped at step seven.

In determining a claimant's ability to perform relevant work, an ALJ must evaluate the claimant's "residual functional capacity" (hereinafter "functional capacity"), which is defined as "the most [a claimant] can still do despite [her] limitations."  20 C.F.R. § 404.1545(a)(1).  When evaluating a claimant's functional

---

[4]  In conducting the eight-step evaluation process, the ALJ considers first whether the claimant is engaging in substantial gainful activity.  20 C.F.R. § 404.1594(f)(1).  The ALJ next considers whether the claimant has an impairment or combination of impairments that meets or equals the criteria for one of the listed impairments.  *Id.* § 404.1594(f)(2).  At step three, the ALJ considers whether there has been a medical improvement.  *Id.* § 404.1594(f)(3).  Then at step four, the ALJ considers whether the improvement is related to the claimant's ability to work.  *Id.* § 404.1594(f)(4).  At step five, the ALJ considers whether any exceptions to medical improvement apply.  *Id.* § 404.1594(f)(5).  At step six, the ALJ analyzes whether the claimant's current impairments in combination are severe.  *Id.* § 404.1594(f)(6).  If the ALJ determines that the claimant's impairments are severe, then step seven requires that the judge evaluate the claimant's residual functional capacity to engage in substantial gainful activity by first considering whether she has the ability to perform past relevant work.  *Id.* § 404.1594(f)(7).  If the claimant cannot do her past relevant work, step eight calls for the ALJ to consider whether, given her residual functional capacity, the claimant is able to do other work in the national economy.  *Id.* § 404.1594(f)(8).

capacity, the ALJ considers the claimant's ability to do sustained work-related activities on a regular and continuing basis, which means 8 hours per day, for 5 days per week. Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).[5] This functional capacity is used to gauge whether the claimant can do past relevant work. *See Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004). In assessing a claimant's functional capacity, the ALJ considers "all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(3). Here, in her past work as an art teacher, Martz worked five days a week, eight hours a day. The job entailed six hours of walking and one and one-half hour of sitting and standing,[6] and Martz was required to lift 10-20 pounds**.**

## C.    The Weight the ALJ Assigned to the Medical Opinion Evidence

Martz's treating physician, Dr. Shanahan, was of the opinion that Martz was unable to perform sedentary work not only up to September 2010, but also after that date and up through the time of the third hearing. Although the ALJ credited Dr. Shanahan's opinion for the period of time from 2007-September 10, 2010, he

---

[5] "Social Security Rulings are agency rulings published under the authority of the Commissioner of Social Security and are binding on all components of the Administration." *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990) (quotations omitted); *see also* 20 C.F.R. § 402.35(b) (stating that Social Security Rulings are published in the Federal Register and are binding on all components of the Social Security Administration). We accord deference to these rulings. *See Fair v. Shalala*, 37 F.3d 1466, 1468–69 (11th Cir. 1994).

[6] The ALJ's decision indicated that Martz's previous position as an art teacher had required "6 hours of walking, and 1 hour of sitting, and ½ hour of sitting." However, based on our reading of Martz's Work History Report, it appears the ALJ meant to say the position required six hours of walking, one hour of standing, and one-half hour of sitting.

did not credit the doctor's opinion that Martz's functional capacity remained deficient after that date.  Martz contends that the ALJ's assignment of little weight to Dr. Shanahan's opinion for the time period commencing on September 11, 2010, was not based on a full and complete reading of the record.  She argues that the judge's implicit disregard of her doctor's testimony, leading to the judge's conclusion that Martz did not remain disabled, is unsupported by substantial evidence.  Similarly, she contends that that the ALJ erred by assigning greater weight to Dr. Griscom's opinion for that same time period because the opinion of a non-examining physician cannot constitute substantial evidence to rebut the opinion of a treating physician.

When evaluating the medical opinion evidence, the ALJ must give the opinion of a treating physician "substantial or considerable weight" unless there is good cause not to do so.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011) (quotations omitted); 20 C.F.R. § 404.1527(c)(2) (stating that the opinion of a treating physician will be given controlling weight if it is supported by medically acceptable and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record).  A treating source is defined as "[the claimant's] own physician . . . who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502.

15

We have nevertheless concluded that good cause exists for affording less weight to a treating physician's opinion when: "(1) [that] opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1241.  Moreover, the opinion of a treating physician may be entitled to less weight when the physician's assessment conflicts with the claimant's own reported daily activities.  *See id.*  If the ALJ chooses to assign less weight to a treating physician's opinion, however, he must clearly articulate his reasons for doing so.  *Id.*

Here, even though the physicians' statements and testimony focused only on whether Martz could do sedentary work[7]—with her treating physicians saying that she could not and the Commissioner's non-examining expert opining that she could—the ALJ reached a conclusion that Martz could perform an even more

---

[7]  Sedentary work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying. . . . Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."  20 C.F.R. § 404.1567(a).  Though sedentary work occasionally requires being on one's feet, "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."  Soc. Sec. Ruling 83-10, 1983 WL 31251, at *5 (S.S.A. Jan. 1, 1983).  Thus, to find a claimant can perform sedentary work, the ALJ must assess whether she can sit for approximately six hours per eight-hour day, and stand or walk for two-hours per eight-hour day, on a regular and continuing basis—which means 8 hours per day, for five days per week.  *See id.*; Soc. Sec. Ruling, 96-8p, 1996 WL 374184, * 1 (July 2, 1996).

16

strenuous level of work:  light work.[8]  The ALJ had to focus on that level of work in order to find that Martz could still perform her past relevant work as an art teacher because the description of the latter job puts it in the "light work" category. As explained, the ability to perform one's past work, which is step seven of the analysis, means that a claimant is no longer disabled.  Stated another way, had the ALJ concluded that Martz could only perform less strenuous sedentary work, he would necessarily have found that she could not perform her past relevant work as an art teacher.  *See* 20 C.F.R. § 404.1594(f)(7).  He then would have been required to move to step eight of the analysis to determine whether there was any other work in the national economy Martz could perform at the sedentary level:  an assessment that typically requires the testimony of a vocational expert.  *See* 20 C.F.R. § 404.1594(f)(7)-(8); *see also Phillips*, 357 F.3d at 1239–40 (explaining that obtaining testimony from a vocational expert is one method an ALJ may use to determine whether a claimant can perform other work).

Thus, we must first determine whether substantial evidence supported the ALJ's determination that Martz could still perform light work as required by her

---

[8]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing. . . ."  20 C.F.R. § 404.1567(b). "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  Soc. Sec. Ruling 83-10, 1983 WL 31251, at *5 (S.S.A. Jan. 1, 1983).  Stated another way, to find that a claimant can perform light work, the ALJ must consider whether she can walk off and on for six hours per eight-hour day, for five days per week.  *See id.*; Soc. Sec. Ruling, 96-8p, 1996 WL 374184, *1 (July 2, 1996).

previous position as an art teacher.  That is not a tough call to make here.  Nothing in the testimony of Martz's treating physicians or even in the statement of the Commissioner's expert suggests that Martz could perform work at this level.  Accordingly, we conclude that substantial evidence did not support the ALJ's decision that Martz could perform light work.

That being so, it would mean that, at most, Martz could be found capable of performing only sedentary work.  But that conclusion, which would trigger step eight of the analysis, would then require the ALJ to look to vocational experts to determine whether jobs in that arena would be available to Martz.  The ALJ did not make this inquiry.

Further, Martz argues that even if we were focusing solely on whether she was capable of performing only sedentary work after September 11, 2010, such a determination by the ALJ would constitute error because it would mean that the ALJ had unjustifiably assigned greater weight to non-treating physician Dr. Griscom's opinion that Martz had experienced significant improvement than to the opinion of treating physicians Drs. Shanahan and Sullivan that, given Martz's limitations, she could not perform even "sedentary work."[9]  The ALJ explained that he assigned greater weight to Dr. Griscom's opinion because the objective

---

[9]  The ALJ did give significant weight to Martz's treating physicians' opinions that Martz was disabled through September 10, 2010.

18

medical evidence showed a "lack of symptoms," good energy levels, no shortness of breath, limited joint pain, and only "some" fatigue, albeit fatigue had been a prominent symptom in the past.

Based on our own review of the record, however, we conclude that the ALJ failed to clearly articulate his reasons for crediting the opinion of the non-examining physician over that of Dr. Shanahan and Sullivan in concluding that Martz's condition had improved significantly enough to allow her to pursue sedentary work. Dr. Shanahan—a board-certified rheumatologist and the former director of Duke University's scleroderma research center clinic—had been Martz's treating physician since 2006. While treating Martz, Dr. Shanahan saw her approximately every three months. Despite Dr. Shanahan's longstanding role as Martz's treating physician during her lengthy and serious illness, the ALJ found that Dr. Shanahan's opinion for the time period commencing on September 11, 2010, was entitled to less weight because the objective medical evidence showed "a lack of symptoms" and only "some" fatigue.

This finding, however, does not reflect a complete reading of the record. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995) ("[We] must consider 'the entire record and take account of the evidence in the record which detracts from the evidence relied on by the [Commissioner].'" (quoting *Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986))). Indeed, the record shows that while Martz

enjoyed some episodes of improvement between 2010 and 2011, it also shows that there were times during this same period when her condition did not improve from a state that the ALJ agreed rendered her disabled. Further, in some instances, her condition worsened.

For example, in a progress note dated September 9, 2010—just one day before the date the ALJ determined Martz's disability terminated—Martz complained of joint pain throughout her entire body, except for her shoulders and elbows. She also reported "lots of fatigue" and underwent an extensive work-up for anemia. On the positive side, she did not report any shortness of breath, muscle weakness, joint swelling, or ulcerations related to Raynaud's phenomena, leading to Dr. Shanahan's impression that, all things considered, Martz was "doing rather well," other than inflammation in her hands.

She was not doing rather well four months later, when on January 21, 2011, she reported to Dr. Shanahan that she continued to suffer from "profound chronic fatigue," which made her "unable to do more than the minimum amount of daily activities such as getting up, bathing, and eating." This fatigue, so pronounced that she had no energy to even go out with her family, required her to rest throughout the day "to alleviate the profound sense of tiredness." On this visit, Martz also reported some shortness of breath. Pulmonary function tests showed a slight improvement in lung volumes and diffusing capacity, but a six-minute walk test

performed by Dr. Shanahan did, in fact, show a slight decrease in Martz's functional capacity. These results led Dr. Shanahan to conclude that Martz's breathing issues were not a result of pulmonary vascular disease, but instead were caused by her anemia.

Thereafter, in a June 17, 2011, progress note, Martz reported that she had "done well" since her last visit, with the exception of persistent joint pain in her right knee. She made no complaints of shortness of breath, muscle weakness, or Raynaud's phenomena-related ulcerations. Notwithstanding the absence of complaints about shortness of breath, Martz's pulmonary function tests showed a decrease in diffusing capacity, that, although mild, was statistically significant. Fatigue was also still listed as "present" in the review of her systems. Additionally, Dr. Shanahan required Martz to undergo a bone marrow biopsy due to a slight increase in her hematocrit numbers.

Contrary to the ALJ's findings, these progress notes do not show a "lack of symptoms" and only "some" fatigue. Instead, they show that Martz's condition fluctuated between September 2010 and June 2011 such that during certain times she reported diminished symptoms, but during other times within this same period, she indicated that her symptoms were severe enough to be incapacitating. In particular, the progress note from January 22, 2011, shows that Martz's fatigue was so severe that she could not do more than the essential life activities of bathing and

21

getting up.  Though the progress note from June 17, 2011, stated that Martz had "done well" since her last visit, it also showed that she had fatigue, dizziness, and lightheadedness, in addition to a statistically significant decrease in pulmonary diffusing capacity.

For these reasons, we conclude that the ALJ has not articulated clear reasons for discrediting Dr. Shanahan's opinion that Martz's fatigue and breathing difficulties were severe and persistent enough to render her unable to perform sedentary work, as defined by regulation.  *Cf. McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986) (concluding that an administrative decision was not supported by substantial evidence, where the ALJ focused on one aspect of the record but ignored other contrary evidence).  In sum, while progress notes, on occasion, show some indication of improvement in Martz's condition, they were also consistent with Dr. Shanahan's opinion that Martz had "persistent and profound fatigue and tiredness," and a "persistent substantial reduction in both the volume of air she can breathe and her diffusing capacity."

What's more, Dr. Shanahan's opinion was bolstered by evidence in the record from Martz's other treating physician, Dr. Sullivan, a physician with the Duke University Division of Cellular Therapy.  On February 25, 2011, Dr. Sullivan provided a statement describing Martz's anemia.  He explained that although Martz had developed anemia in March 2007, she did not begin to

22

experience extreme fatigue and low platelet and red blood cell counts until May 2010. Dr. Sullivan's statement that Martz had "thankfully" not developed myelodysplastic syndrome or leukemia does not change the fact that he also noted that she continued to have persistent low red blood cell counts and low hemoglobin and hematocrit levels associated with her "autoimmune hemolytic anemia."

The record shows that Martz's symptoms similarly waxed and waned from 2007 through September 2010: the period of time in which the ALJ found her to be disabled. Indeed, progress notes dated April 27, 2007 and March 22, 2010, among others, stated that Martz was "doing well," but the existence of those intermittent healthier days did not prompt the ALJ to find no disability during this time period. Surprisingly then, the ALJ relies on the same sorts of statements that Martz was "doing well" in the more recent progress notes to discredit Dr. Shanahan's confirmation of the same disabling symptoms after September 10, 2010. *See Sharfarz v. Bowen*, 825 F.2d 278 (11th Cir. 1987) (concluding that statement in doctor's progress note that claimant was doing "significantly better" did not provide a sound basis to discredit opinion of doctor who had treated claimant for six months). We are unable to discern why the ALJ concluded that Martz's waxing and waning symptomology dictated a finding of disability from 2007 until 2010, but this same sort of symptomology did not dictate a finding of

23

disability after September 10, 2010, especially given the substantial increase of her symptoms in January 2011.[10]

As to the ALJ's assignment of significant weight to the opinion of the non-examining medical expert, Dr. Griscom, for the time period commencing on September 11, 2010, the opinion of a non-examining physician, by itself, does not constitute good cause for affording less weight to a treating physician's opinion, because the opinion of a non-examining physician is entitled to less weight when it contradicts that of the treating physician. *Johns v. Bowen*, 821 F.2d 551, 554 (11th Cir. 1987). Nor do "[t]he reports of reviewing nonexamining physicians . . . constitute substantial evidence on which to base an administrative decision." *Lamb v. Bowen*, 847 F.2d 698, 703 (11th Cir. 1988).

Just as the ALJ failed to offer clear reasons for discrediting the treating physicians' assessment of Martz's condition, it is similarly unclear why he gave Dr. Griscom's opinion controlling weight. *See Johns*, 821 F.2d at 554; *Lamb*, 847 F.2d at 703. Indeed, in light of the longstanding relationship and frequent treatment Martz underwent with Dr. Shanahan and of the fact that Dr. Shanahan's opinion was bolstered by the medical records of Dr. Sullivan, the ALJ's reasons for assigning greater weight to the opinion of Dr. Griscom than to the opinion of Dr.

---

[10] Given the absence of clearly-articulated reasons by the ALJ for discrediting Dr. Shanahan's opinion, we do not address Martz's alternative argument that consideration of the regulatory factors supports assigning enhanced weight to Dr. Shanahan's opinion.

Shanahan is not supported by the record evidence.  Specifically, both Drs. Shanahan and Sullivan went into great detail in their respective statements in describing Martz's condition and in explaining why her impairments had resulted in fatigue severe enough to render her unable to perform sedentary work.  There was no such level of detail in Dr. Griscom's briefer hand-written interrogatory responses explaining why he concluded that Martz did not suffer from the symptoms her treating physicians reported her to have.  Dr. Griscom remarked on the fact that some of her medical notes showed improvement, but improvement is a relative concept and, by itself, does not convey whether or not a patient has recovered sufficiently to no longer be deemed unable to perform particular work on a sustained basis.  Further, in his responses, Dr. Griscom alludes to various lab test results, but he does not explain how these objective measures of the functioning of Martz's systems undermine her or her doctors' testimony.

In short, we conclude that the ALJ did not articulate clear reasons for accepting the comparatively conclusory statements of the expert over those of Martz's treating physicians.

### D.    Credibility Determination

Martz also argues that the ALJ improperly discredited her subjective testimony regarding the severity of her impairments beginning on September 11, 2010.  She contends that her limited work activity and minimal daily activities do

25

not demonstrate an ability to perform substantial gainful activity nor do they contradict her claim of disabling impairments.

To establish a disability based on subjective testimony of pain and other symptoms, the claimant must establish: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); 20 C.F.R. § 404.1529.

We have determined that credibility determinations are within the province of the ALJ. *Moore*, 405 F.3d at 1212. Nevertheless, if the ALJ rejects a claimant's subjective testimony regarding pain, the ALJ must articulate specific reasons for doing so. *Wilson*, 284 F.3d at 1225. Otherwise, the claimant's testimony must be accepted as true. *Id.* Although the ALJ need not cite to "particular phrases or formulations" to support his credibility determination, the ALJ must do more than merely reject the claimant's testimony. Instead, his decision must provide a reviewing court with a basis to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1210 (quotations omitted). "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Foote*, 67 F.3d at 1562.

At the final administrative hearing, Martz testified that her chronic fatigue prevented her from returning to work full-time. She explained that the fatigue is so severe sometimes that she cannot function or get off of the couch. The ALJ credited Martz's testimony regarding the limiting effect of her impairments on her ability to work until September 10, 2010. However, the ALJ did not find credible Martz's statements regarding the intensity, persistence, and limiting effects of her symptoms for the time period commencing on September 11, 2010, to the extent those statements were inconsistent with his ultimate determination that Martz had the functional capacity to perform the full range of light work.

Here, the ALJ's reasoning for discrediting Martz's subjective complaints of impairment is not supported by substantial evidence. The ALJ found that Martz's medically determinable impairments could reasonably be expected to produce the alleged symptoms. *See Wilson*, 284 F.3d at 1225. But the ALJ concluded that the evidence contradicted Martz's testimony about the extent of her impairments because (1) the objective medical evidence showed "a lack of symptoms" and only "some" fatigue; (2) Martz worked two days per week, seven hours per day; and (3) Martz testified that she cooks and drives.

As explained above, absent some clearer explanation by the ALJ, substantial evidence does not support the ALJ's decision that Martz's testimony was undermined by objective medical evidence. Again, we note that the evidence

27

provided by Martz's treating physicians was consistent with Martz's subjective complaints of impairment. *See supra*, Part. II.C.

The ALJ also reached his conclusion that Martz could perform light work based, in part, on her daily activities and the fact that she performed part-time work. Martz acknowledged that she obtained a part-time job at the Boca Raton Art Museum in August 2010, that called for two days' work per week, for seven hours per day.[11] Indeed, the applicable regulations state that the work a claimant has done during the period during which she claims to be disabled, even if the work does not constitute substantial gainful activity, may show that the claimant is able to do more than she actually did. *See* 20 C.F.R. § 404.1571 ("The work . . . that [the claimant has] done during any period in which [the claimant believes she is] disabled may show that [the claimant is] able to work at the substantial gainful activity level. . . . Even if the work [the claimant has] done was not substantial gainful activity, it may show that [the claimant is] able to do more work than [she] actually did.").

Yet, that Martz held a part-time job that called for working two days per week, for seven hours per day, does not necessarily indicate that she had the ability to perform light work or sedentary work on a continued and sustained basis, as found by the ALJ. Again, when evaluating a claimant's functional capacity, the

---

[11] She explained that she did so because she had always worked and had become depressed just sitting idle in her home throughout each day.

28

ALJ considers the claimant's ability to do sustained work-related activities on a regular and continuing basis, which means 8 hours per day, for 5 days per week. Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  As noted, light work requires standing or walking, on and off, for approximately six hours out of an eight-hour day.  20 C.F.R. § 404.1567(b); Soc. Sec. Ruling 83-10, 1983 WL 31251, at *5 (S.S.A. Jan. 1, 1983).  Nothing in Martz's part-time job duties suggest that she complied, or could comply, with those requirements.  As noted, Martz contended that she was unable to work more than the seven hour a day, two-day a week schedule.  Further, Martz's employer was very accommodating of her limitations, allowing her to stay seated as long as she needed to, and even to go home early if necessary.

As to her daily activities, Martz testified that she is able to cook simple meals and to drive short distances.  But she also testified that her husband does the more heavy-duty household chores.  The regulations permit the ALJ to consider a claimant's daily activities when evaluating her subjective symptoms of impairment.  *See* 20 C.F.R. § 404.1529(c)(3) (indicating that the ALJ looks at several factors, including the claimant's daily activities when evaluating the claimant's subjective symptoms).[12]  However, having the stamina to cook simple

---

[12]  At oral argument, the Commissioner noted that Martz also began volunteering with adolescents two days per week in March 2010.  Though this assertion is supported by a progress note dated March 22, 2010, it is not clear from the record the number of hours Martz volunteered

29

meals and to drive five to ten miles at a time does not necessarily constitute substantial evidence sufficient to discredit Martz's claims that she is not able to perform light (or perhaps even sedentary) work on a regular and continuing basis given her claim of ongoing and persistent fatigue. *Cf. Foote*, 67 F.3d at 1561 (explaining that substantial evidence did not support the ALJ's discrediting of claimant's testimony that her pain was so disabling so as to affect her residual functional capacity because, although she testified that she was able to do some daily activities, she also testified that she was unable to do other daily activities).

Given the ALJ's limited explanation for discrediting Martz's subjective complaints of impairment, we remand for the district court to instruct the ALJ to reassess Martz's credibility in light of the above principles. *Cf. Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990) (remanding for ALJ to reconsider claimant's functional capacity because ALJ improperly discredited claimant's subjective complaints and therefore failed to give adequate consideration to the effect of the claimant's limitations on her ability to work).

### E.    Denial of Martz's Request to Cross-Examine the Medical Expert

Martz argues that the ALJ violated her due process rights by not permitting her to cross-examine Dr. Griscom. She contends that the ALJ denied her request

---

or what sorts of activities the volunteering entailed. In short, it is not clear whether Martz's volunteering supported the ALJ's functional capacity determination. Because the ALJ did not refer to Martz's volunteer activities when discrediting her testimony or in concluding that she had the functional capacity to perform light work, we do not consider Martz's volunteer activities here.

for cross-examination based on his overwhelming caseload, and not because he determined that cross-examination was irrelevant to the issues presented in the case.

Due process requires the "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).  A claimant is also entitled to a full and fair hearing.  *Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985) (explaining that when a claimant is not represented by counsel, the administrative record must show that the claimant received a full and fair hearing).

The determination of whether cross-examination is warranted appears to be within the discretion of the ALJ.  *See Demenech v. Sec'y of Dep't of HHS*, 913 F.2d 882, 884 (11th Cir. 1990) (assuming, without deciding, that that the ALJ has the discretion to determine whether cross-examination is warranted).  Indeed, the Social Security Regulations provide that, "[w]hen it is reasonably necessary for the full presentation of a case, an administrative law judge or a member of the Appeals Council may, on his or her own initiative or at the request of a party, issue subpoenas for the appearance and testimony of witnesses. . . ."  20 C.F.R. § 404.950(d)(1).[13]  Moreover, though the Social Security Administration's

---

[13]  The Administrative Procedures Act further provides that a party may "conduct such cross-examination as may be required for a full and true disclosure of the facts."  5 U.S.C. § 556(d); *see Richardson v. Perales*, 402 U.S. 389, 409–10 (1971) (applying § 556(d) of the

31

Hearing, Litigation, and Appeals Manual ("HALLEX") states that the preferred

method for obtaining the opinion of a medical expert is through live testimony, it

also states that the ALJ may obtain such testimony through medical interrogatories.

HALLEX, Vol. I, § I-2-5-30, Medical or Vocational Expert Opinion—General,

*available at* https://ssa.gov/OP_Home/hallex/I-02/I-2-5-30.html (last visited March

1, 2016).  *But see Roberts v. Comm'r of Soc. Sec. Admin.*, 644 F.3d 931, 933 (9th

Cir. 2011) (stating that the HALLEX is not binding authority).

After Dr. Griscom completed the first set of interrogatories, an

administrative hearing was held in March 2011.  At the hearing, the ALJ agreed to

send Dr. Griscom a second set of interrogatories at the request of Martz's attorney

because the first set did not address Martz's anemia.  Then after Dr. Griscom

completed the second set of interrogatories, the ALJ allowed Martz's attorney to

draft her own set of interrogatories for Dr. Griscom to complete.  Martz received

the completed interrogatories on September 2, 2011, several weeks before the third

and final administrative hearing held on September 22, 2011.

Although the ALJ denied Martz's request to cross-examine Dr. Griscom, we

conclude that her due process rights were not violated.  She was given the

opportunity to challenge and rebut Dr. Griscom's findings before the ALJ issued

---

Administrative Procedures Act in the social security context, concluding that this statutory provision was consistent with the authority given to the Commissioner under the Social Security Act); *Calvin v. Chater*, 73 F.3d 87, 91 (6th Cir. 1996) (stating that social security hearings must comply with the requirements of the Administrative Procedures Act).

his decision.  Further, the interrogatories in this case met the demands of due process by providing Martz with a meaningful opportunity to confront the evidence adverse to her claim.  *See Flatford v. Chater*, 93 F.3d 1296, 1306 (6th Cir. 1996) ("We are unpersuaded that interrogatories may not provide a meaningful opportunity for a disability claimant to confront the evidence he believes to be adverse to his claim.").  "Due process is flexible and calls for such procedural protections as the particular situation demands."  *Mathews*, 424 U.S. at 334.  This is especially true given the situation that unfolded here, where the medical expert completed three sets of interrogatories prior to the final administrative hearing. Martz was allowed to draft the third set of interrogatories and there was no limitation on her ability to ask Dr. Griscom any question that she deemed relevant. In fact, she specifically asked Dr. Griscom to explain the basis for his conclusions concerning her fatigue and to identify any reasons why he would discount Dr. Shanahan's opinion regarding the impact of her impairments.

Nevertheless, relying on our decision in *Demenech*, the district court determined that Martz's due process rights were violated because the ALJ relied heavily on Dr. Griscom's report but did not permit Martz to cross-examine him.[14] Martz urges us to conclude—as did the district court—that procedural due process required that she be permitted to cross-examine Dr. Griscom.  In *Demenech*, a

---

[14]  The district court nevertheless affirmed the ALJ's decision to deny continuing disability benefits, concluding that any error by the ALJ in disallowing cross-examination was harmless.

33

consultative physician examined the claimant and submitted a medical report <u>after</u> the administrative hearing. *Demenech*, 913 F.2d at 883–84. That physician found that the claimant's condition had improved to the point he could return to work. *Id.* Refusing to allow the claimant to respond to the report or to cross-examine the consultative physician, the ALJ determined that the claimant had experienced a medical improvement and could return to his past relevant work. *Id.* On appeal, we concluded that the ALJ should have permitted the claimant to cross-examine or depose the physician because such questioning could have revealed the physician's methods for arriving at his conclusions, the evidence he relied on, and the certainty with which he concluded that the claimant was no longer disabled. *Id.* at 885. Accordingly, we held that "where the ALJ substantially relies upon a post-hearing medical report that directly contradicts the medical evidence that supports the claimant's contentions, cross-examination is of extraordinary utility." *Id.*

The present case, however, is distinguishable from *Demenech* because it does not involve a post-hearing medical report.[15] *See id.* Unlike the claimant in *Demenech*, Martz had the opportunity to challenge and rebut Dr. Griscom's findings before the ALJ issued his decision. *See id.*; *see also Cowart v. Schweiker*,

---

[15] As noted by the Commissioner at oral argument, the post-hearing medical reports in *Demenech* are also distinguishable from the present case because they involved a consultative medical examination and new medical findings. *See Demenech*, 913 F.2d at 883–85. Here, Dr. Griscom did not make any new medical findings, but instead merely quoted excerpts from the medical records provided by Martz to explain why he believed her able to do sedentary work. Dr. Griscom brought no new information to the table.

662 F.2d 731, 737 (11th Cir. 1981) (noting that we were concerned that the claimant had no opportunity to challenge or rebut the physician's findings in a post-hearing medical report). Moreover, nothing in *Demenech* suggests that its holding applies with equal force to medical reports submitted prior to the administrative hearing, or that a claimant has a due process right to cross-examine a physician where the claimant has had the opportunity to rebut or challenge the medical report through alternative means, such as interrogatories, which Martz did here. *See generally Demenech*, 913 F.2d 883–85. Indeed, even now Martz is quite vague about what additional questions she might have asked Dr. Griscom had he appeared live.[16]

As a final matter, the record does not support Martz's contention that the ALJ denied her request to cross-examine Dr. Griscom based on his administrative workload. Although the ALJ referenced his "atrocious" workload, he did not deny Martz's request to cross-examine Dr. Griscom on that basis. Instead, the ALJ denied the request because Martz had already been given the opportunity to submit multiple interrogatories to the expert.

---

[16] Even were there a due process violation, Martz has also demonstrated no prejudice. Indeed, in comparison with the detailed testimony of the treating physicians, the sparseness and conclusory nature of Dr. Griscom's opinion, in which he mostly repeated snippets of phrases in the medical records, has been very helpful to Martz in persuading us that the ALJ did not satisfy the requirements necessary to allow the opinion of a non-examining physician to trump that of a treating physician. Martz has offered no explanation how a further examination of Dr. Griscom, in which Martz prodded him to actually put some meat on the bones of his generalized opinion, would have helped her cause. Indeed, Martz has identified no specific evidence or information that she contends would have been uncovered by live cross-examination of the doctor.

35

In short, Martz had the opportunity to be heard in a "meaningful manner" because she was able to challenge Dr. Griscom's responses to the interrogatories before the ALJ issued his decision.  She was able to argue inferences contrary to the doctor's inferences based on what was an undisputed record.  *See Mathews*, 424 U.S. at 333; *see also Cowart*, 662 F.2d at 737; *Demenech*, 913 F.2d 882, 884–85.  We therefore conclude that Martz's due process rights were not violated.

## III.  CONCLUSION

We cannot conclude that substantial evidence supports the ALJ's decision because he did not clearly articulate his reasons for (1) assigning less weight to the treating physicians' opinion than to that of the non-examining physician and (2) discrediting Martz's testimony regarding her subjective complaints of impairment.  Accordingly, we **VACATE** the district court's order granting summary judgment in favor of the Commissioner and **REMAND** with instructions to remand the case to the Commissioner for further proceedings consistent with this opinion.